COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

The CHASE MANHATTAN BANK, Suc-
cessor of The Chase National Bank of
The City of New York, Trustee and
Alleged Transferee of Marie Elizabeth
Moran, Respondent.

The CHASE MANHATTAN BANK, Suc-
cessor of The Chase National Bank of
The City of New York, Trustee and Al-
leged Transferee of Marie Elizabeth
Moran, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 16488.

United States Court of Appeals
Fifth Circuit.

Aug. 19, 1958.

Rehearing Denied Oct. 23, 1958.

L. W. Post, Ellis N. Slack, Attys., Dept. of Justice, Washington, D. C., Herman T. Reiling, Asst. Chief Counsel, Charles O. Johnson, Sp. Atty., Internal Revenue Service, Washington, D. C., Charles K. Rice, Lee A. Jackson, Asst. Attys. Gen., for petitioner.

C. W. Wellen, Whitfield H. Marshall, M. S. McCorquodale, Fulbright, Crooker, Freeman, Bates & Jaworski, Charles W. Hall, Houston, Tex., for taxpayer, The Chase Manhattan Bank.

Before CAMERON, JONES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case turns on the community property law of Texas.[1] Stated broadly, the question before us is the gift tax effects of trusts and insurance in a community property state where the wife has a present, vested ownership of half the marital community in her own right.

The proceedings are brought to this Court by a petition and a cross-petition for review of a Tax Court decision concerning the transferee liability of the taxpayer, Chase Manhattan Bank, successor to Chase National Bank of New York, for gift taxes for the year 1948. 25 T.C. 617 (1955). The alleged transferor is Mrs. Marie Elizabeth Moran, widow of Daniel J. Moran.[2] Marie is alleged to have made gifts of her share of her community property by "acquiescing" in the benefits of three trusts—an insurance trust, a living trust, and a testamentary trust—established by her husband.[3]

---

1. (a) In general, see de Funiak, Principles of Community Property (1943); McKay, Community Property (1925); Speer, Law of Marital Rights in Texas (1929); Huie, The Community Property Law of Texas, 13 Vernon's Ann.Tex.Civ.Stat., VII–XLVI (1951); Haddaway, Community Property in the Administration of Estates, 33 Tex.L.Rev. 1012 (1955); Childress, Community Property in the Administration of Estates in Texas, Proc.Tex.Inst., 5th Annual Tax Conf. (1957), p. 155. Of special historical interest: Schmidt, Civil Law of Spain and Mexico (N. O. 1851).

(b) Jackson, Community Property and Federal Taxes, 12 Sw.L.J. 1 (1958); Huie, Community Property and Life Insurance, Proc.Tex.Inst., 5th Ann.Tax Conf. (1957), p. 118; Morrison, Life Insurance—Tax Aspects, Proc.Tex.Inst., 5th Ann.Tax Conf. (1957), p. 142; Thurman, Estate Tax on Insurance, 9 Stan.L. Rev. 238 (1957); Stephens, Life Insurance and Community Property in Texas—Revised, 10 Sw.L.J. 343 (1956); Hammond and Ray, Federal Tax Problems in Community Problems, 8 S.W.L.J. 127 (1954); Benjamin and Pigman, Federal Estate and Gift Taxation of Louisiana Life Insurance, 28 Tul.L.Rev. 75, 243 (1954); Eichenbaum, Estate Taxation of Insurance Proceeds in Community Property, 1952 Tul.Tax Inst., p. 251; Swift, House Bill 900 and Your Life Insurance Policy, 20 Tex.Bar J.No. 11, p. 691 (1957); Sterling, note on War-

than v. Haynes, 35 Tex.L.Rev. 449 (1957); Note—36 Tex.L.Rev. 92 (1957).

(c) See especially Huie, Community Property Law as Applied to Life Insurance, 17 Tex.L.Rev. 121 (1939); 18 Tex. L.Rev. 121 (1940); Collection of Articles in U. of Texas Institutes, Business and Family Planning, Proc. 5th Ann.Tax. Conf. (1957).

(d) See also Nabors, Civil Law Influences upon the Law of Insurance in Louisiana, 6 Tulane L.Rev. 515 (1932); Young, Taxation of Community Life Insurance, 13 Tul.L.Rev. 424 (1939); Daggett, the Community Property System of Louisiana (2nd Ed., 1952); Cahn, Civil Law as applied to Life Insurance, 12 La.L.Rev. 56 (1951).

2. Marie filed a gift tax return for 1948 with the Collector of Internal Revenue for the First District of Texas. Venue on appeal therefore lies with this Court under Section 7482 of the 1954 Code, 26 U.S.C.A. § 7482. Since no return was filed by Chase, the transferee-taxpayer, the parties have stipulated for review by this Court in order to avoid any possible question as to venue.

3. None of the deficiency determined against Chase as trustee and transferee was assessed against Marie. No claim was made that Marie was insolvent or that she was unable to pay the full amount of any gift tax that might be due. The determination of a deficiency against Chase was made after expiration of the time within which a gift tax de-

## I. The Three Trusts.

Daniel James Moran and Marie Elizabeth Moran were maried before 1922 and remained husband and wife until Daniel died April 3, 1948. Their legal domicile was Texas during their entire married life. Daniel had no separate property.

November 2, 1928, in New York, Daniel created a living trust, naming as trustee, The Equitable Trust Company, a predecessor to Chase. The trust estate consisted of securities belonging to the community. Income was payable to Daniel for life, then to Marie for life, with the remainder to the settlor's descendants. Daniel reserved the right to modify or revoke the trust. He reserved no powers of control over the administration of the trust.

November 2, 1928 Daniel also created an insurance trust with the same trustee. The trust estate consisted of insurance policies on Daniel's life. Daniel paid the insurance premiums with community funds. He reserved the right to modify or revoke the trust; and under the policies he had the right to change the beneficiaries. Upon Daniel's death the insurance proceeds were payable to the trustee. Income was payable to Marie for life, with the remainder to the settlor's descendants. The insurance trust agreement provides that the validity and effect of the trust shall be governed by the law of New York; the living trust instrument contains a similar provision.

Daniel's will provided for a testamentary trust of his residuary estate, Marie to receive the income for life, the remainder to be divided among Daniel's descendants. Chase, the trustee, was given broad discretionary power to distribute principal to any beneficiary.

## II. Conflicting Contentions.

A. The Commissioner held that on Daniel's death the living trust and insurance trust became irrevocable and the testamentary trust came into being. (1) As to the testamentary trust, the Commissioner took the position that Marie was put to an election under Daniel's will and that she elected to take under the will, relinquishing her half of the community for a life estate in that half. (2) As to the living trust, the Commissioner held that it became a completed gift by husband and wife when Daniel died without having exercised his right of revocation. (3) Section 86.2(a) of Treasury Regulations 108 specifically covers insurance payable revocably to a third person and purchased with community funds. The Commissioner held that on the husband's death there was a gift by the wife of one-half the amount of the proceeds of the insurance.

The Commissioner valued the gift to each trust as the difference between what he concluded that Marie gave up (her community one-half share of the trust estate) and what she retained (a life estate in her one-half). The resulting deficiency for the three trusts amounted to $133,378.88.[4] This was assessed against Chase as trustee and transferee under Section 1025 of the Internal Revenue Code of 1939.

B. Chase, represented by the same New York lawyers who drew the trusts and the will,[5] filed a petition in the Tax

---

ficiency could have been determined against Marie. See Section 1025, Internal Revenue Code of 1939, 26 U.S.C.A. § 1025.

4. (1) On April 3, 1948, the date of Daniel's death, the principal of the living trust amounted to $640,480.49. Marie's life interest in one-half of that principal would be worth $128,689.18; the value of her life interest in the entire trust estate would be $257,378.37. (2) The proceeds of the insurance policies paid to the trustee on Daniel's death amounted to $239,014.04. The value of

Marie's life interest in one-half of the insurance trust would be $48,024.13; the value of her life interest in the entire trust estate would be $96,048.25. (3) The value of the principal of the residuary trust on April 3, 1948, was $1,010,844.25. The value of Marie's life interest in one-half of that trust would be $203,104.94; and in the entire trust estate would be $406,209.88.

5. The will named Chase as Co-Executor with Charles A. Perlitz. Chase did not qualify but it was appointed as Ancillary Executor in New York.

Court contending that Marie had made no taxable gifts; but, if she had, that the Commissioner's measure of each gift should be reduced by the value of the life estate she received in her husband's one-half of each trust. (1) Chase's petition, filed May 22, 1953, stated that the estate was still under administration and that *"no determination has yet been made as to whether or not the said Marie Elizabeth Moran has elected to take under the will."* The petition alleges however, "upon information and belief", that Marie's motive *"in not taking against* the will was to benefit herself" and that her "failure to take against the will * * * was an arms length transaction * * * entered into by Marie upon the advice of her attorney * * * as economically advantageous". (2) As to the living trust and (3) insurance trust, Chase insisted that Marie had no community interest at the time of Daniel's death; her community interest was transferred when the trusts were created in 1928. As in the case of the testamentary trust, Chase claimed that Marie's transfers were "business transactions * * * for her own benefit".

Marie did not join in the petition. Marie did not testify. There is no testimony in the record as to Marie's alleged "motives". There is none as to any "arms length" negotiations between Marie and the trustee. There is no evidence as to any affirmative act by Marie showing an intention to transfer any interest to Chase. The stipulation of facts was between Chase and the Commissioner. It has one short unenlightening paragraph referring to Marie's receipt of income from the trusts:

"Marie Elizabeth Moran has, since the date of decedent's death received income from each of the three trusts referred to above in accordance with the provisions of the said trust agreements and of the will of Daniel J. Moran."

One witness testified, briefly. Charles A. Perlitz, Executor, stated: he informed Marie that he would collect the properties in the estate and turn them over to Chase; "Mrs. Moran had had no experience in business matters whatever"; she knew nothing about the trusts; she had never asked if she had a right to move against the trusts or the will; he did not "volunteer that she might have some right to bring suit against the trustees"; "somewhere down the line when I told her that she ought to make a will or someone, I think the lawyers probating the will, told her she ought to make a will, and then there was some reference there to her community interest and whether she should take on the will or not—under the will—but that was long subsequent to the time when the will had been probated".

At the trial the Commissioner and Chase agreed in assuming that Daniel's will put Marie to an election. Apparently, they agreed also that Marie's receipt of income from the trust was sufficient to show that she had elected to take under the will. They differed only as to whether the effect of the election was that she had made a taxable gift.

Chase, in its petition and at the trial, alleged that Daniel provided a trust for his wife "of his entire residuary estate, *including the property that Marie Elizabeth Moran owned with him in community"*. This, we must point out now, is a contradiction in terms. Daniel Moran could put his wife to an election. But Daniel Moran's residuary estate could no more include his wife's one-half of the community property than it could include Chase Manhattan's properties on Pine Street in the city of New York.

C. A majority of the Tax Court, held that Daniel's will put Marie to an election and that Marie's "acquiescence" in the testamentary trust constituted a taxable gift. The Court held that the living trust was testamentary, that Daniel gave away nothing while he lived, and the principal remained community property. When, however, Marie acquiesced in the trust by accepting the income, she thereby elected to surrender her community property interest in the principal. This, said the Court, was a taxable gift. The Tax Court agreed with Chase that

the value of each gift was one-half of the value of the principal less the life estate in the whole. The tax deficiency was fixed at $27,426.06, plus interest amounting to $12,189.20.

As for the insurance trust, the Tax Court held that, under the law of Texas, a surviving wife has no community property interest in the proceeds of policies payable to a third party beneficiary. Marie's failure, therefore, to assert such rights could not be treated as constituting a taxable gift. The *logically necessary extension of this holding would require that the entire amount of insurance proceeds be included in the gross estate of a deceased husband in Texas* (and perhaps in other community property states)—when a husband insures his life in favor of a trustee or other third person beneficiary, using community funds to pay the premiums, and reserving the right to change the beneficiary.[6]

D. Alarmed at this turn, mainly with respect to the insurance trust but also disagreeing on the valuation of the gifts of Marie's interests in the other trusts,[7] the Commissioner filed a motion for reconsideration. The Tax Court reaffirmed its original decision. The Commissioner appealed.

Chase, trustee, cross-appealed, represented by Texas attorneys. Now, for the first time in the case, the point is made that in Texas a deceased husband's residuary estate does not include his wife's share of the community; that Daniel's will does not purport to dispose of Marie's share and therefore she was not put to an election. If Marie transferred her share to the trust, which Chase, the trustee, in this Court *now* denies, the transfer is said at most to create a revocable trust not subject to a gift tax in 1948. For various reasons, some new in the proceedings, Chase contends that Marie did not make a gift of her interest in the living trust or in the insurance trust; but, if she did, it is claimed that the value of such gift is half of the principal less her life estate in the whole. Chase is willing to agree with the Tax Court that no taxes are owed on the insurance trust. Chase asserts that its transferee liability, if any, was limited to one-half of the cash-surrender value of such policies; the taxpayer relies on two recent Supreme Court cases.[8]

### III. New Issue Raised on Appeal.

The Commissioner objects to the trustee now arguing that Marie was not put to an election. The taxpayer, the Commissioner contends, is not at liberty to urge as a ground for reversal a point not raised in the court below. Indeed, says the Commissioner, the taxpayer invited error. We think that the taxpayer did invite error. Worse, the invitation was accepted. But an appellant has no vested right in an opponent's error of law in the lower court—especially when the protesting appellant is the Commissioner of Internal Revenue. The Commissioner owes a duty to the United States government to litigate zealously in the interest of collecting taxes. But he owes a duty to all taxpayers, including the litigating taxpayer, to see that the tax law is applied justly.

6. The proceeds of the insurance policy were included in full in the taxable estate of Daniel J. Moran and an estate tax deficiency based upon that assumption claimed by the Commissioner of Internal Revenue was paid by the Executor of the Estate of Daniel J. Moran. The Commissioner is now asserting a deficiency in gift tax with respect to one-half of the proceeds held by the trustee, upon which he has already collected an estate tax deficiency based upon the inclusion of the entire proceeds in Moran's taxable estate.

7. A similar question on the gift tax valuation of a wife's election to take under her husband's will was then pending in the 9th Cir. and has since been decided in the taxpayer's favor. Commissioner of Internal Revenue v. Siegel, 9 Cir., 1957, 250 F.2d 339.

8. United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 and Commissioner of Internal Revenue v. Stern, 1958, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed. 2d 1126. And, of course, Rowen v. Commissioner, 2 Cir., 1954, 215 F.2d 641.

We sympathize with any litigant who has filed a brief on appeal and is then confronted with his opponent's brief raising a new issue. We sympathize also with Marie, who was not represented in the Tax Court proceedings and whose interests, to our way of thinking, were in conflict with the trustee's interests. And we sympathize with taxpayers generally who may be affected adversely if, contrary to our convictions and understanding of the law, we allow an erroneous decision to go into the books and generate additional error.

Federal procedure is moving away from what Pound calls "the sporting theory of justice", Wigmore the "instinct of giving the game fair play", and Arthur Vanderbilt the theory of procedure as "a contest between two legal gladiators".[9] We are a Court "to secure the just * * * determination of every action". Rule 1, Federal Rules of Civil Procedure, 28 U.S.C.A.

Daniel's will is in the record and speaks for itself. "[W]here, as here, the case below was tried, not upon any misapprehension of the facts, but upon a misapprehension of the effects of those facts in law, appellant may not be prevented from pressing here for the application, to the proven facts, of the correct principles of law." Associated Indemnity Corp. v. Scott, 5 Cir., 1939, 103 F.2d 203, 209. "We see no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties." Smith Engineering Co. v. Rice, 9 Cir., 1938, 102 F.2d 492, 499. Cf. Erie v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

Tax liability as to the testamentary trust depends on whether Daniel's will put Marie to an election. The question is in the case. A just determination of the appeal requires us to decide it.

## IV. The Community Property System.

For many years taxpayers in common law states, with a legitimate interest in tax uniformity, and taxpayers in community property states, with a legitimate interest in tax recognition of the realities of the community property system, were at cross purposes.[10] Finally, Congress enacted the equalization provisions of the Revenue Act of 1948—to put tax-

9. "The sporting theory of justice, the 'instinct of giving the game fair play', as Professor Wigmore has put it [1 Wigmore on Evidence, p. 127], is so rooted in the profession in America that most of us take it for a fundamental legal tenet. But it is probably only a survival of the days when a lawsuit was a fight between two claims * * * it is peculiar to Anglo-American law * * * In America we take it as a matter of course that a judge should be a mere umpire. * * * The idea that procedure must of necessity be wholly contentious disfigures our judicial administration at every point. It leads the most conscientious judge to feel that he is merely to decide the contest, as counsel present it according to the rules of the game, not to search independently for truth and justice. * * * It creates vested rights in errors of procedure, of the benefit whereof parties are not to be deprived. The inquiry is not, What do substantive law and justice require? Instead, the inquiry is, Have the rules of the game been carried out strictly? * * * put back the offending team five or ten or fifteen yards. * * *" Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, 29 ABA Rep. 395 (1906). "The fundamental premise of the federal rules is that a trial [and its sequel, an appeal] is an orderly search for truth in the interest of justice rather than a contest between two legal gladiators with surprise and technicalities as their chief weapons * *." Vanderbilt, Introduction to Cases and Materials on Modern Procedure and Judicial Administration (1952), p. 42.

10. There are eight traditional community property states: Louisiana, Texas, California, Washington, Arizona, New Mexico, Idaho, and Nevada. Texas derived its community property law from Spain by way of Mexico. Louisiana derived its community system from the Custom of Paris, then from Spanish law in 1769, and finally from the Code Napoleon. The laws of Texas and Louisiana on community property for the most part are substantially similar. The Bureau of Internal Revenue recognized their similarity as to insurance proceeds in Rev.Rul. 48, 1953-P, Cum.Bull. 392.

payers in all states on the same tax basis and at the same time recognize the logical tax effects of community property principles. It is important therefore that we weigh the issues carefully, in the interest of giving full weight to the community property law of Texas—while we give full weight to the tax laws of the United States. This takes a little doing.

 A few basic principles characterize the community property system. Their application here is determinative of the issues in this case.

The community property system comes from the custom of the women of the Visigoths and other Germanic tribes sharing the fighting and the spoils of war with their men; it owes its strength to the civilized view that marriage is a full partnership. Husband and wife are equal partners. Each has a present, vested half interest in all community property. All property accumulated during marriage is community property, unless it is received by gift, devise, or inheritance.[11] In Texas even income derived from separate property belongs to the community, including interest and dividends from separately owned securities. The husband is the manager of the community. But this management is not equivalent to ownership.[12] He acts as a managing agent or trustee or managing partner of a limited partnership. The husband may sell or donate community property but not in fraud of his wife's rights.[13] The earnings of the husband during marriage are community, and property purchased with such earnings is also community. The wife's rights, aside from managerial control, are the same as the husband's. Thus, on death or divorce the community is divided equally. Neither spouse has testamentary disposition over the other's half of the community. The wife has complete testamentary disposition over her half and may leave it even to her paramour.[14] Upon the death of either spouse, a community property state levies an inheritance tax on the decedent's half of the community.[15] Since 1948 (and prior to 1942), only the decedent's half is includible in his gross estate for federal tax purposes.[16]

### V. The Testamentary Trust.

Whether Marie made a taxable gift of her interest in the community to the trustee under Daniel's testamentary trust depends upon whether: (A) the will put her to an election and (B) she elected to take under the will.

 A. If the provisions of a will require a legatee to surrender his property, or his statutory interest in property, to the executor or trustee as a condition to receiving the legacy, the legatee must make an election to take the legacy under the will or to renounce the will and preserve the rights which otherwise would be surrendered. One who accepts the benefits of the will must adopt the whole contents so far as the will con-

11. Tex.Rev.Civ.Stat.Ann., Article 4619 provides that all property acquired by either husband or wife during marriage, except the separate property (Articles 4613, 4614) shall be deemed the common property of the husband and wife; and on dissolution of the marriage there is a presumption that all of the effects are as community.

12. The wife has the management and control, if the husband becomes insane, or if he should disappear and his whereabouts be unknown for 12 months. Tex. Rev.Civ.Stat.Ann. Arts. 3678, 4619.

13. Arnold v. Leonard, 1925, 114 Tex. 535, 273 S.W. 799; Martin v. McAllister, 1901, 94 Tex. 567, 63 S.W. 624, 56 L.R.A. 585; Stramler v. Coe, 1855, 15 Tex. 211; Coss v. Coss, Tex.Civ.App.1918, 207 S.W. 127.

14. Rogers v. Trevathan, 1887, 67 Tex. 406, 3 S.W. 569; Moss v. Helsley, 1883, 60 Tex. 426; Brown v. Pridgen, 1882, 56 Tex. 124.

15. Hansen v. Blackmon, Tex.Civ.App.1942, 169 S.W.2d 955, affirmed, 1943, 140 Tex. 536, 169 S.W.2d 962.

16. Lang v. Commissioner, 1938, 304 U.S. 264, 58 S.Ct. 880, 82 L.Ed. 1331; Commissioner of Internal Revenue v. Cadwallader, 9 Cir., 1942, 127 F.2d 547; Wardell v. Blum, 9 Cir., 1921, 276 F. 226, certiorari denied 258 U.S. 617, 42 S.Ct. 271, 66 L.Ed. 793.

cerns him, and renounce every right inconsistent with it. Dunn v. Vinyard, Tex.Com.App.1923, 251 S.W. 1043; Dakan v. Dakan, 1935, 125 Tex. 305, 83 S.W. 2d 620; White v. Hebberd, Tex.Civ.App. 1936, 89 S.W.2d 482; State v. Jones, Tex. Civ.App.1927, 290 S.W. 244; 44 Texas Jurisprudence 285.

Because of a long history of stoutly supporting a wife's vested ownership of half the community, Texas courts are loath to divest a widow of her share of the community on loose inferences. A study of the cases shows five major obstacles standing in the way of an election.

(1) *A presumption exists that a testator intends to dispose of his property only.* In Whaley v. Quillin, Tex.Civ.App. 1941, 153 S.W.2d 969, 971, involving a will in which the testator left his residuary estate in trust for his wife, the court held that the will disposed of the testator's share only; that "the law presumes that no man will attempt to dispose of another's property through the instrumentality of a will * * * the law will deprive no man of his property by conjecture". See also the leading cases of Avery v. Johnson, 1917, 108 Tex. 294, 192 S.W. 542 and Ellis v. Scott, Tex. Civ.App.1933, 58 S.W.2d 194.

(2) *Only where the testator's intention to dispose of property that is not his own is shown by clear and unequivocal language is a husband's will construed to devise his wife's property.* Pope v. Pope, Tex.Civ.App.1943, 175 S.W.2d 289. "In order that the necessity of an election shall take place, the testator must affect to dispose of property which is not his own, and also make a valid gift of his own property." McFarland v. Campbell, 5 Cir., 1954, 213 F.2d 855, 857. See also Couts v. Holland, 1908, 48 Tex.Civ.App. 476, 107 S.W. 913; Haby v. Fuos, Tex. Civ.App.1894, 25 S.W. 1121; Edds v. Edds, Tex.Civ.App.1926, 282 S.W. 638; Gibony v. Hutcheson, 1899, 20 Tex.Civ. App. 581, 50 S.W. 648.

(3) *The language of the will must be susceptible of no other construction.*

" * * * [The law] deprives no man of his property merely by conjecture. * * * For a will to be given the effect of an attempted disposition of property not owned by the testator, it is required that the language of the will conclusively evidence such a purpose. In such cases it is not sufficient that the will may be construed as revealing such an intention. It is necessary that it be open to no other construction." Avery v. Johnson, 1917, 108 Tex. 294, 192 S.W. 542, 544. If a will is ambiguous as to whether a testator attempted to dispose of both halves of the community, only the testator's half passes under his will. "[I]f this will should be construed to be ambiguous on the question as to whether the testator intended to bequeath the entire community estate, or merely the interest he owned therein, then the law furnishes a solution by requiring that it be given the construction that only the property owned by the testator was intended to pass thereunder." Schelb v. Sparenburg, 1939, 133 Tex. 17, 124 S.W. 2d 322, 326. See also Gulf C. & S. F. R. Co. v. Brandenburg, Tex.Civ.App.1914, 167 S.W. 170.

(4) *Use of the first person singular pronoun shows an intention to dispose of the testator's property only.* In Haley v. Gatewood, 74 Tex. 281, 12 S.W. 25, 26, the testator used the language, "I will and bequeath all the estate I now own and possess". The Texas Supreme Court held: "We do not think this language indicates an intention on the part of the testator to dispose of any part which he did not own or possess." In Sailer v. Furche, Tex.Com.App.1930, 22 S.W.2d 1065, 1066, the same result was reached where the testator made a testamentary disposition to his wife of "all property, real, personal, and mixed, of which I may die seized and possessed, wherever situated". A devise of "my" property is construed as referring only to the testator's interest in the community property. Sauvage v. Wauhop, Tex.Civ. App.1912, 143 S.W. 259.

(5) *Finally, the will must give some benefit to replace the property surren-*

*dered by the election.* Smith v. Butler, 1892, 85 Tex. 126, 19 S.W. 1083; Packard v. De Miranda, Tex.Civ.App.1912, 146 S.W. 211.

It is in the light of this consistent reluctance of Texas courts to base an election on uncertain inferences that Daniel's will must be examined.

The critical language in Daniel's will creating the testamentary trust provides:

"Fifth: I give, devise and bequeath all of the rest, residue and remainder of the property, both real and personal, *which I shall own or to which I may be entitled at the time of my death* (hereinafter referred to as *my* 'residuary estate') by *my* Trustee of the residuary trust created hereby, in trust * * * "

"Tenth: In the administration of *my* estate, *my* executor shall have power * * * "

"Eleventh: In the administration of any trust created hereby *my* Trustees shall have power * * * "

"Twelfth: In the administration of *my* estate * * * "

Under the law of Texas, the only property Daniel owned or to which he was entitled at the time of his death was his half of the community. The care with which Daniel defined such property as *his residuary estate*, limiting it to the property to which *he* was entitled, seems to negate the construction that he intended to dispose of property he did not own. The studied absence of reference to the community or to Marie's share of the community seems to contradict the contention that Daniel disposed of the entire community, including Marie's half.

Thus, (a) the unambiguous definition of the residuary estate as restricted to property which Daniel owned or was entitled to at the time of his death, (b) the use of the first person singular pronoun, and (c) the complete absence of any dispositive language relating to Marie's share indicate that Daniel did not purport to include Marie's half of the community in the testamentary trust of his residuary estate.

If no intention to dispose of Marie's property can be found in Paragraph Five, then it is difficult to read such an intention into the will, since that paragraph is the only one that is dispositive of the residuary estate. The Commissioner relies however on Paragraph Seventeen that is explanatory rather than dispositive. The paragraph reads:

"Seventeenth: The provisions herein contained for the benefit of my wife are in lieu of dower and any or all other provisions statutory or otherwise for her benefit as my widow."

This provision is meaningless in a community property state such as Texas. There is no dower in Texas. And, a wife's ownership of half the community is not analogous to the common-law inchoate right of dower. One is a present, vested ownership. The other is a mere expectancy that may be snuffed out. In Texas a wife shares in community property not as a widow, but as a wife, *ipso jure*, the moment property is acquired. Community property has nothing to do with benefits for widows. Marie, under Texas law, therefore, had no rights of the character referred to in Paragraph Seventeen, as Judge Murdock pointed out in his dissent to the Tax Court holding.[17]

17. "Murdock, J., dissenting: * * * Her husband had no legal right to dispose of her property by his will, and it seems wrong to conclude as a matter of law that he did so under the terms of paragraph Fifth of his will. I do not understand how he could impose binding conditions in his will dependent solely upon what Marie would do with her own. Paragraph Seventeenth of the will imposed no real penalty upon Marie had she chosen to consider that her share of the community property following the death of her husband was not included in his testamentary trust. It does not appear that under the laws of Texas she had any dower rights or other rights, as the widow of her deceased husband, of the kind mentioned in paragraph Seventeenth. Certainly she did not acquire her right to one-half of the community property as widow of her deceased hus-

Since there is no language in the will to give aid and comfort to his view, the Commissioner is compelled to resort to speculation based on circumstances outside of the will. He contends that the husband's customary handling of all business matters and the wife's inexperience and lack of knowledge justify the conclusion that Daniel must have intended to dispose of all their property (her property included) by giving her a life estate with a competent trustee in charge for her protection. These circumstances exist in most marriages. If an election exists because a husband is experienced and a wife inexperienced in business, then a great majority of all wills put the wife to an election. Such speculation strikes us as a shaky basis for divesting a wife of her ownership of half the community.

If we must speculate, we would give considerable weight to the fact that Daniel was married and lived under Texas community property law for twenty-six years. He was a man of affairs, a man of property, head of Continental Oil Company. In the last six years of his life, something like a cold war existed between the community property states and the noncommunity property states. Taxpayers of means were well aware of the tax involvements inherent in community property. It is difficult to believe that Daniel would not have stated his intentions clearly—if he had intended to require Marie to give up her half of the community as a condition to receiving his bounty.[18] We think also that it is not without significance that when Texas attorneys, familiar with community property law, entered the case (on appeal), they reacted allergically to the contention that the will purported to put Marie to an election, or that she had made an election.[19]

band. She had that right during their marriage. Had she accepted the Fifth paragraph of his will as applying to the property owned by her husband at the time of his death but not as applying to her property at that time, she could have received the life estate in the property which he properly and legally placed in his testamentary trust and her transfer to the same trust of property which belonged to her at the death of her husband was not consideration for the life estate which her husband gave her in his property."

18. Contrast the language of Daniel's will with the language of Siegel's will: "The provisions made in this my Last Will and Testament for my beloved Wife, Mildred Irene Siegel, are in lieu of her community rights and interests, and if she elects to take her community interest, in lieu of taking under this my Last Will and Testament, then the bequests made to her in Paragraph Three hereof shall be of no force and effect and the real and personal property so bequeathed shall become a part of the rest, residue and remainder of my said estate to be distributed to my said trustees, and likewise subdivision (a) of paragraph Seven shall be of no force and effect and she shall take nothing as a beneficiary under said trust." Commissioner of Internal Revenue v. Siegel, 9 Cir., 1958, 250 F.2d 339, 342.

19. The Commissioner cites two extreme cases, Delevan v. Thom, Tex.Civ.App. 1951, 244 S.W.2d 551 and Baldwin v. Baldwin, 1940, 134 Tex. 428, 135 S.W. 2d 92. In Delevan v. Thom the record showed that the widow was of unsound mind when her husband died and was incapable of speech or of voluntary movement. This condition had existed for some time prior to her husband's death. The will was made five months before the testator died. These circumstances and the fact that the court found four or five expressions in the will indicating the testator's intention to dispose of his wife's share of the community, induced the Court to hold that the will put the widow to an election. In Baldwin v. Baldwin the testator stated that all of the property owned by his wife and himself was community, except her separate property, and he expressly recognized that his wife shared in the estate. The testator left several specific legacies of community property to third persons, showing a clear intention to dispose of his wife's share along with his. The will contained an election provision. All of this, plus fifteen years of administration by the wife as executor, induced the Court to hold that there was an election. Delevan v. Thom and Baldwin v. Baldwin may be distinguished or explained; in any event they are exceptional cases and against the trend. In each case the court starts its opinion by

B. If it might be said that the will puts Marie to an election, the record does not show that Marie did in fact elect to take under the will. Chase, the Trustee and Ancillary Executor, in its complaint filed in the Tax Court in 1953, *five years after Daniel's death*, alleged that "no determination has yet been made as to whether or not the said Marie Elizabeth Moran has elected to take under the will". If anyone should know, Chase should know. Perlitz, the Executor, in his brief testimony, said that Marie had never asked "whether she had any right to move against the trust" or "against the will"; and that he had never "volunteer[ed] that she might have any right to bring suit against the trustees".

In the absence of any showing in the record that Marie had sufficient knowledge of her rights to make a conscious choice, it can hardly be said that she made an election. "In the absence of statutory regulation, it may be generally said that two things are necessary in order that acts relied upon will amount to an election: First, the party must have had knowledge of his rights; that is, he must have had knowledge of the condition and extent of the estate, and of his duty to choose between the inconsistent rights; second, that he intended to elect, as shown by his words and acts, viewed in the light of all the circumstances." Dunn v. Vinyard, Tex.Com.App.1923, 251 S.W. 1043, 1046.

In Rippy v. Rippy, Tex.Civ.App.1932, 49 S.W.2d 494, 497, a widow sued the executor of her husband's estate for her one-half community property share. The defense was that her husband's will had put her to an election, and that by receiving money under the will she had made an election. The court held for the wife stating that: "But, if the terms of the will required appellee to elect to take thereunder, the evidence is undisputed that she had no knowledge of her rights

in the premises, nor that she was required *to choose between inconsistent rights* * * * she accepted the $500 without any knowledge that she was required to choose between two inconsistent rights."

In this case, as in Rippy v. Rippy and in Dunn v. Vinyard, there is no showing, so far as the record goes, that Marie had knowledge of her rights, nor that she understood that it might be said she was to choose between two inconsistent rights. There is no element of estoppel here. No one was misled to his prejudice. Marie received no benefits to which she was not entitled—on the assumption that Daniel created a trust of his half. The full income was hers: half in her own right for her share of the community, half as income beneficiary under the trust. She was entitled, therefore, to receive the full income from the trust.

The record is barren of any evidence to show intention by Marie to create a trust by allowing Chase to have possession of her share of the community. In community property states a widow may leave her share of community with the executor, usually a bank that serves also as trustee under a testamentary trust created by the deceased husband. The reasons are twofold: (1) to continue the administration of the former community as a whole and (2) to give a widow the benefit of a bank's custodial and managerial services. There was no necessity therefore, as in Delevan v. Thom, Tex.Civ.App.1951, 244 S.W.2d 551, that all of the Moran community be included in a trust; and there was nothing unusual about Marie receiving all of the income. It seems to us that, on the record, all that can be said of Chase's possession of Marie's share of the community is that it was held by the bank as agent or custodian. If it could be said that Marie created a trust under Texas law, the trust would be revocable (and therefore not subject to a gift tax.)[20]

---

bowing in the direction of the line of decisions holding that in determining whether the will disposes of the beneficiary's property, the rule is that the will does not so dispose of the property

unless it is "open to no other construction".

20. Tex.Rev.Civ.Stat.Ann. Art. 7425b–41: "Every trust shall be revocable by the

Weighing the language of the will and all the circumstances, we agree with the taxpayer that the will did not put Marie to an election and she made no effort to elect. Accordingly, Marie made no taxable transfer of her share of the community. It is still in her taxable estate. If she chooses to follow her husband's example, she may do so now by gift or by will. This determination gives full effect to the community property law of Texas, is consistent with the gift tax law, and is in the interest of justice: a wife is not divested of ownership of her share of the community by a loose construction of a will.

## VI. The Insurance Trust.

The Commissioner's position is that on Daniel's death Marie made a taxable gift of one-half of the value of the proceeds of the insurance policies less the value of a life estate in that half. Chase, the trustee, contends (on appeal) that, although Daniel could revoke the trust and change beneficiaries, Marie could not, and as to her the trust was complete and irrevocable in 1928 when it was created, and therefore there is no tax. The Tax

Court held that there was no tax. Under Texas decisions, as the Tax Court construed them, since a surviving wife has no community property interest in the *proceeds* of insurance payable to a named beneficiary,[21] Marie could make no taxable gift involving any part of the proceeds. We agree with the Commissioner.

If the decision of the Tax Court is upheld, consistency would require that the entire proceeds of insurance policies be included in a husband's estate, notwithstanding his ownership of only half of the marital community. The results reached by the Tax Court (A) violate principles of Texas community property law, (B) are contrary to the pre-1942 tax cases (now revitalized by the Revenue Act of 1948), and (C) frustrate the national policy of tax equalization expressed in the Revenue Act of 1948 and interpreted in the regulations carrying out that policy.

A. The holding of the Tax Court is not surprising in view of the apparent inconsistency of the Texas cases and the professed inability of some authorities to find a rational basis for reconciling the cases.[22] We have no desire to rush in

---

trustor during his lifetime, unless expressly made irrevocable by the terms of the instrument creating the same or by a supplement or amendment thereto." [Acts 1943, 48th Leg., p. 232, ch. 148, § 41.]

21. The Tax Court held: "However, the law of Texas appears to be that where the marriage is terminated by the death of the husband, the proceeds of the policies are payable to the named beneficiary and the wife does not have any community property interest that can be asserted against such proceeds. Cf. Jones v. Jones, Tex.Civ.App., 146 S.W. 265, 269; Rowlett v. Mitchell, 52 Tex.Civ. App. [589], at p[age] 592, 114 S.W. [845], at p[age] 847; Martin v. McAllister, 94 Tex. 567, 569, 63 S.W. 624, 625 [56 L.R.A. 585]. Furthermore, it has been held that upon the death of the insured husband any cash surrender value the policy may have had during his lifetime lapses, and no claim based upon a supposed interest in such cash surrender value can succeed. Volunteer State Life Ins. Co. v. Hardin, 145 Tex. 245, 197 S.W.2d 105, 168 A.L.R. 337; San Jacinto

Bldg. v. Brown, Tex.Civ.App., 79 S.W. 2d 164. The distinction may appear to be a bit unusual, but we must take the law of Texas as we find it. Until the Texas courts indicate otherwise, we must assume that the foregoing cases correctly establish the law of Texas, and they *appear* to hold that the wife has no community property interest in the proceeds of the policies upon the husband's death."

22. William O. Huie, Professor of Law of the University of Texas, a recognized authority on the community property system of Texas, reviewed the cases in 1939–1940. Community Property Law as Applied to Life Insurance, 17 Tex. L.Rev. 121 (1939), 18 Tex.L.Rev. 121 (1940). In a recent paper on the same subject he stated: "I was unable at that time [1939–1940] to fit all of the Texas cases into any rational, consistent scheme, and that is still the situation today. The primary difficulty has been a fundamental inconsistency in the Texas cases as to the concepts to be applied, an inconsistency that began long ago and has persisted . with stubborn tenacity.

where Texans fear to tread. If, however, there is a rational principle running through the Texas cases, we must find it and apply it: local law determines property rights.[22a] We believe that a close study of the Texas cases shows that the inconsistency is only apparent, not real, and that there is a discoverable touchstone for applying orthodox community property principles to insurance. The touchstone is the distinction between *policy-rights* and *proceeds-rights*.[23]

■ Our study of the Texas cases indicates that the doubt that has arisen as to whether insurance is property subject to ownership by the community has been caused by courts failing to *say* that they distinguish between *policy-rights* and *proceeds-rights*. Texas courts consistently make this distinction in their holdings. And consistently recognize that policy-rights are a property asset of the community, and proceeds-rights are property of the named beneficiary (after maturity of the policy)—however often one encounters the language "insurance is not property" in cases involving contests over proceeds.

Policy-rights include the whole bundle of incidents of ownership of property in a policy—all the rights except the right to the proceeds. This bundle includes

It can be described as *a difference of opinion over whether or not a life insurance policy is property."* Texas Institutes, Business and Family Planning, p. 119; Proc. 5th Annual Taxation Conference (1957). See also Stephens, Life Insurance and Community Property in Texas—Revised, 10 S.W.L.J. 343 (1953); Notes, 35 Tex.L.J.Rev. 449 (1957), 10 S.W.L.J. 326 (1956). J. Paul Jackson, who had an active part in working out the tax equalization program in 1948 that attempts to harmonize community property concepts of insurance with the tax laws, does not go so far. "While the cases generally have regarded the insurance policies and the avails thereof as but another species of community property to be governed by the usual community property rules, dicta in some of the cases have rather suggested that life insurance is sui juris, that policies of life insurance are not property in the community property sense, and that the life insurance laws are a gloss upon the community laws." Jackson, Community Property and Taxation, 12 S.W.L.J. 1, 40 (1958).

22a. See Paul, Selected Studies in Federal Taxation (2d ser. 1938); Cahn, Local Law in Federal Taxation, 52 Yale L.J. 799 (1943); Lang v. Commissioner, 1938, 304 U.S. 264, 58 S.Ct. 880, 82 L.Ed. 1331. But from 1942 to 1948 state property law was a mirage, as far as solace for taxpayers is concerned.

23. "This difficulty stems in large part from the failure to distinguish between rights in the policy during life and rights in the proceeds following the insured's death; * * * A further source of confusion arises from the fact that although occasionally the individual may possess

all of the rights in the policy as well as in its proceeds, these rights may be, and usually are, divided in various combinations." Thurman, Federal Estate and Gift Taxation of Community Property Insurance, 9 Stan.L.Rev. 239 (1957). See also, Eichenbaum, Estate Taxation of Insurance Proceeds in Community Property States, 1952 Tulane Tax Institute 251. A thorough analysis of the nature of the community's ownership of insurance and the distinction between policy-rights and proceeds-rights may be found in Benjamin and Pigman's Federal Estate and Gift Taxation of Louisiana Life Insurance, 28 Tul.L.Rev. 75, 243 (1953, 1954). After the submission of the substance of this article in the form of a memorandum to the Treasury Department, the Bureau issued Rev.Rul. 48, 1953–1 Cum.Bull. 392 reversing its position on insurance and holding that "[i]t is the position of the Bureau that, under the laws of Louisiana and Texas, a gift by the wife of one-half of the policy proceeds becomes absolute, for Federal gift tax purposes, upon the death of the husband, unless he purchased the policy with intent to defraud the wife, since at that time the community is dissolved, the authority of the husband as statutory manager of the community is ended, the policy matures, and the wife's interest therein is terminated; whereas, during the existence of the marital community any revocable transfer of rights is necessarily incomplete since the husband, acting for himself and as agent of his wife, may change the beneficiary, surrender the policy for cash, or exercise other legal incidents of ownership in accordance with the terms of the policy or the laws of the State."

all "the economic benefits of the insurance, the cash surrender value, the power to change the beneficiary, the power to surrender or cancel the policy, the power to assign the policy or revoke an assignment, the power to pledge the policy for a loan, the power to obtain from the insurer a loan against the surrender value of the policy".[24] These are property rights, as any lawyer or business man knows. They are owned by the marital community when the community pays for the insurance and there is a revocable designation of beneficiary. The right to insurance proceeds is also property just as any other contractual right to money is property, but it is in the beneficiary by a contract which the husband as manager of the community can legally make. If the right to change the beneficiary is reserved, the beneficiary's proceeds-rights are inchoate until the death of the insured, when these proceeds-rights vest by virtue of the terms of the contract; but in this sense only can it be said that insurance (i. e., the right to the proceeds) is not property subject to the laws of descent, heirship, or community property.

▪ No one familiar with the workings of the community property system should be surprised that Texas courts hold that the wife has no interest in insurance proceeds received by a third party beneficiary. *In the absence of fraud, the wife has no interest in any commu-nity property a third person has received by sale or donation,* even though half of the property transferred was the wife's. The wife's lack of interest in the proceeds, however, is not inconsistent with the view that the *community* effects a gift of the proceeds to a third person beneficiary.

There is not one case in Texas that fails to recognize, *in result,* that insurance *is* property: when the policy-rights are at issue or, if proceeds-rights are at issue, when the contest is between the surviving spouse and a third party beneficiary and there is no fraud.[25] There is smog only when there is a contest between the surviving spouse, or her heirs, and the insured, or his heirs, and the practical effect of applying these principles would be to allow the husband to augment his separate estate at the expense of the community. That factual situation is not present in this case.

The Tax Court recognized that up to the time of Daniel's death the insurance (at least, the cash surrender value) was community property in which the wife had a vested interest. The Tax Court and Chase, the trustee, did not recognize, however, that when Daniel took out the insurance and created the insurance trust, he acted and could act only as manager of the community. The right of revocation was not in Daniel individually, nor was the trust irrevocable only as to Marie's half of the community. Daniel

24. Benjamin and Pigman Federal Estate and Gift Taxation of Louisiana Life Insurance, 28 Tul.L.Rev., 243, 247 (1954).

25. "If a third party is named beneficiary, the usual rules relating to gifts of community property obtain. In Texas, unlike the civil law in some jurisdictions, the husband as manager of the community may make limited gifts of community property. Such gifts, however, are subject to the rule that the transfer must not be in fraud of the wife's community rights. Here the rule is not an absolute one, but relative, being largely a matter of degree and substantiality. If the gift is large in relation to the size of the community, and particularly, if made to one not an intimate member of the family group, the wife may, as to one-half, succeed in having it set aside. These rules would apply to gifts of life insurance. If the policy is assigned outright to a child or other third party and is not in fraud of the wife's rights, husband and wife each have made a gift of one-half. If a third party is named beneficiary and the right to change beneficiaries is retained, the gift is incomplete until the death of the insured, at which time the rights of the beneficiary become vested and the spouses at that time have completed their gift. But if either the assignment of the policy or the beneficiary designation is in fraud of the wife's rights, she may recover half of the policy proceeds." Jackson, Community Property and Federal Taxes, 12 S.W.L.J. 1 (1958).

held the power of revocation as agent or manager of the community. When he died without having exercised that power, the insurance became payable and the trust became irrevocable. His death operated to effect a taxable transfer from the community (husband and wife), rather than to preclude a taxable transfer from Marie, as the tax court seemed to think.

A review of the jurisprudence shows that the Texas courts invariably treat policy-rights in insurance as property that is a community asset. Just as invariably, they hold that in the absence of fraud, the wife has no community interest in the proceeds of insurance payable to a third party beneficiary.

The first case to deal with the problem is the frequently cited case of Martin v. Moran, 1895, 11 Tex.Civ.App. 509, 32 S. W. 904, 906. The husband insured his life *for the benefit of his own estate*, paying premiums with community funds. The Court held that the wife had a half interest in the proceeds. The Court accepted the proposition that insurance was property and analogized an insurance policy to a promissory note taken during the marriage for a loan of community funds and paid after the death of the husband. The analogy is not sound as to insurance proceeds payable to a third party beneficiary, since the promissory note is really payable to the community. The analogy is sound as to insurance payable to the husband's estate, only if he is regarded as acting as agent for the community in designating his estate as beneficiary. The result, however, is sound; not because insurance *proceeds* are a community asset, but because the Court in that case found it was fraudulent for the husband to augment his separate estate at the expense of the community. The Court said: "The husband can give his interest in the community property to another, but he cannot give his wife's interest [in the community] to himself."

In the converse of the situation, where an insurance policy is payable to the *wife*, Texas law is clear that the proceeds are *her* separate property. San Jacinto Bldg., Inc., v. Brown, Tex.Civ. App.1935, 79 S.W.2d 164; Evans v. Opperman, 1890, 76 Tex. 293, 13 S.W. 312; Davis v. Magnolia Petroleum Co., 134 Tex. 201, 134 S.W.2d 1042; Blackmon v. Hansen, 1943, 140 Tex. 536, 169 S.W.2d 962. That is because the husband is manager of the community, she is not; he can make a gift of community to her, but not to himself. These cases and Martin v. Moran, too, are good community property law.

Martin v. McAllister, 1901, 94 Tex. 567, 63 S.W. 624, 625, has been criticized as a horrible example of what happens when insurance proceeds are not treated as community assets. In that case, the husband took out a policy on the wife's life, *named himself as beneficiary*, and paid the premiums with community funds. The Supreme Court of Texas held that the wife's heirs were not entitled to share in the proceeds: "The right to the proceeds of the policy * * * rests upon the same principle * * * that the proceeds of the policy belong to the person named as payee, and it becomes property upon the contingency of the death of the insured". Martin v. Moran was not cited, but the holding is not necessarily inconsistent, since the Court could "see no ground *in the facts of this case* to impeach the action of the husband as fraudulent" toward his wife. Since the proceeds-rights "could not become the property of the husband or wife during the lifetime of both of them, it cannot be held to be community, and is therefore the separate property of the one to whom it is made payable". ' There is confusing language in the opinion, such as the statement that "a policy of insurance is not a piece of property; it is the evidence of a contract".[26] But the Court's thinking clearly centered about the proceeds-rights. Up to the moment of transfer, the policy-rights are commu-

---

26. This quotation comes from an early Louisiana case, Succession of Hearing, 1874, 26 La. Ann. 326.

nity assets; after the transfer, the wife has no interest. On the assumption that there was no fraud, the case is in line with the principle—stronger in Texas than in most community property states—that the husband can dispose freely of community assets.

This is brought out clearly in Rowlett v. Mitchell, 1908, 52 Tex.Civ.App. 589, 114 S.W. 845, 847, in which community funds were used to pay premiums on a policy payable to *third persons*, the husband's children by his first marriage.[27] The policy was taken out before the second marriage. In a contest between the beneficiaries and the second wife the court held for the beneficiaries. "The right of the husband to dispose of the community estate except for the purpose of defrauding his wife is an absolute one * * * he may expend their joint estate ever so unwisely, may squander it in 'riotous living,' or may give it away."

The next case, Jones v. Jones, Tex. Civ.App.1912, 146 S.W. 265, also involved the question whether the husband had acted in fraud of his wife. Shortly before his death the insured substituted his father for his wife as beneficiary on a policy purchased with community funds. The Court, relying on Rowlett v. Mitchell and Martin v. McAllister, held for the beneficiary on the ground that the evidence was insufficient to show fraud. The Court said that "an insurance policy is not property". But, as in Rowlett v. Mitchell, the holding involved a contest with a third party beneficiary over proceeds.

These important early cases were on proceeds-rights. Whiteselle v. Northwestern Mutual Life Ins. Co., Tex.Com. App.1920, 221 S.W. 575, involved a contest over policy-rights. Here, there was

a divorce and the issues were whether the community had a claim for reimbursement for premiums paid and whether the cash surrender value was an asset of the community. The Court rejected the wife's claims. Texas courts have now reversed their position on cash surrender. In San Jacinto Bldg. v. Brown, Tex. Civ.App.1935, 79 S.W.2d 164, the wife was the beneficiary, and a creditor of the husband was attempting to reach community property. The Court held that the cash surrender value was a community asset, but it was consumed in the payment of the proceeds to the wife; that the proceeds were the separate property of the wife. Russell v. Russell, Tex. Civ.App.1935, 79 S.W.2d 639, gave full recognition to this characteristic of insurance in holding that upon divorce a wife is entitled to one-half the cash surrender value of a policy purchased with community funds. This result was approved in Locke v. Locke, Tex.Civ.App. 1940, 143 S.W.2d 637, another divorce case, in which the court specifically stated that the cash surrender value of the policy is a community asset, and that the wife has a vested one-half interest in this asset. This was followed in Berdoll v. Berdoll, Tex.Civ.App.1940, 145 S. W.2d 227, and Womack v. Womack, 1943, 141 Tex. 299, 172 S.W.2d 307, 308.

Womack v. Womack is a direct recognition by the Texas Supreme Court that the policy rights in an insurance policy constitute community property. This was a divorce case involving policies on the lives of both spouses. The Court stated: "The courts of this State have held that the 'cash surrender value' of a policy is property, and may be considered and treated as community property." Whiteselle was expressly overruled. The Court based its holding on a broad

---

27. In Kemp v. Metropolitan Life, 5 Cir., 1953, 205 F.2d 857, 860, this Court held that there could be *constructive* fraud where a husband named his sisters as beneficiaries. This Court said: "It is now settled that a policy of life insurance is regarded in Texas as property." In Kemp v. Metropolitan Life, 5 Cir., 1955, 220 F.2d 952 we held that there was no fraud on the wife's rights on a finding that the husband had recognized a duty to support his sisters and had acted fairly toward his wife, even though the proceeds amounted to more than half of the community estate. See also Aaron v. Aaron, Tex.Civ.App.1943, 173 S.W. 2d 310.

construction of property, extending to "every species of valuable right and interest"; and on the intention of the Texas legislature, "to give the term 'community property' a broader meaning than it was originally given [in Article 4619, Vernon's Annotated Civ.Stat.]". The Court pointed out that "many of the modern decisions hold that a life insurance policy is property".

Thompson v. Calvert, Tex.Civ.App. 1957, 301 S.W.2d 496, carried Womack to its logical conclusion. That case, like the instant case, involved policies on the husband's life taken out during marriage and paid for with community funds, the insured retaining the right to change the beneficiary. On the wife's death, the Court, approving a ruling of the Texas Attorney General in 1949, treated the policy-rights as a community asset and held that one-half of the cash surrender value of the policies at the time of the wife's death should be included in the wife's estate for inheritance tax purposes.[28]

Blackmon v. Hansen, 1943, 140 Tex. 536, 169 S.W.2d 962, dealt with proceeds. In that case the Texas Supreme Court held that where insurance on a husband's life, payable to the wife, was paid for with community funds, one-half of the proceeds should be included in the husband's gross estate in calculating the State Inheritance Tax. This is on the community property principle that the husband is responsible for only half of the transfer (transformation) of policy-rights into proceeds-rights; the other half comes from the wife herself. Had the insurance been payable to the husband's estate, still only half of the proceeds could have been included in *his* taxable estate. The Court followed Lang v. Commissioner, 1938, 304 U.S. 264, 58 S.Ct. 880, 82 L.Ed. 1331, in which the United States Supreme Court reached

the same conclusion based not on the wife's ownership of the proceeds but on (1) her payment of half of the premiums and (2) her husband's possession of the incidents of ownership as agent of the community.

Blackmon v. Hansen and Thompson v. Calvert establish the Texas rule for taxation of insurance on the life of a husband when the premiums are paid with community funds and the insured retains the right to change the beneficiary. That is the basic factual situation in the instant case. Since both the state and federal laws for estate-inheritance and gift tax purposes "tax the transfer of a present vested interest, state cases interpreting the Texas Inheritance Tax Law should be decisive for the Federal Court in applying state law". Morrison, Life Insurance—Tax Aspects, 5 Texas Institutes, p. 139 (1957). Applying Blackmon v. Hansen to federal estate and gift taxes applicable to insurance payable to a third person, one-half of the proceeds are includible in the husband's estate and one-half are a taxable gift to the wife.

Volunteer State Life Ins. Co. v. Hardin, 1946, 145 Tex. 245, 197 S.W.2d 105, 168 A.L.R. 337 points up the distinction we are seeking to make. There the insured husband named his two sisters as beneficiaries. On the death, first of the wife, and later of the husband, the wife's son and sole heir asserted a claim to share in the proceeds to the extent of one-half of the cash surrender value at the date of his mother's death. The court held that neither the community nor the wife had a vested right to share in the proceeds of the policies. Martin v. McAllister was quoted with approval. As Professor Huie points out: " * * * the decision in the Hardin case was basically sound. The problem before the court was how far the husband could

---

28. On the authority of Thompson v. Calvert and Womack v. Womack, the Attorney-General of Texas ruled recently that: where a wife willed the residue of her estate to three named beneficiaries, for inheritance tax purposes, decedent's half

of the cash surrender value of certain insurance on the surviving husband's life passed to the beneficiaries. Opinion No. WW–446, June 6, 1958, CCH Inheritance Tax Rep. 1958, para. 18,786.

go in making gifts of community property to third persons. * * * [The] result seems in line with the better view in cases involving gifts of third persons * * * Such gifts, whether by means of life insurance or otherwise, are sustained if they are not deemed a fraud on the wife's' community rights".[29]

In other words, the Texas courts *do* treat insurance as property; and, they are "basically sound"—as long as they hold that the husband may give to anybody but his estate. That is the basic position of critics of the Texas courts.

Sherman v. Roe, 1953, 153 Tex. 1, 262 S.W.2d 393, 397, concerned the death of a husband and wife in an airplane crash, before enactment of the Texas Simultaneous Death Act, V.A.T.S. Probate Code, § 47. Insurance on the husband's life was taken out before his marriage and paid for with separate funds until his marriage. The proceeds were payable to the wife if she survived him, otherwise the proceeds were payable to his estate. It could not be determined who died first. The Court cut the Gordian knot by awarding the proceeds equally to the estates of husband and wife on the theory that the proceeds were community. The Court relied on the statutory presumption in Article 4619 that "all the effects which the husband and wife possess at the time the marriage may be dissolved shall be regarded as common effects or gains, unless the contrary be satisfactorily proved". The

opinion shows the dialectic difficulty courts in community property states have in handling insurance. The Court denied that "the certificate was community property and [that] consequently the proceeds must be community property". Yet in asserting that the proceeds should be regarded as part of the "effects possessed" at the dissolution of the marriage, the court necessarily treated the contract right to the proceeds as property in existence at the dissolution of the marriage, although maturing on the death of the insured.

Warthan v. Haynes, Tex.1956, 288 S. W.2d 481, termed "the ultimate bombshell",[30] has been widely discussed and criticized in Texas.[31] In that case husband and wife were killed in an automobile accident. Unlike Sherman v. Roe it was established that the wife died some fifteen to thirty minutes before her husband. There were three insurance policies on the husband, one taken out before marriage. The wife was the primary beneficiary and the husband's estate the alternate beneficiary in two of the policies; the third had no provision for an alternate beneficiary. The contest was between the respective administrators of the estates of the husband and wife. The majority of the Court awarded the proceeds of all three policies to the husband's separate estate, without any right to reimbursement to the community for funds used to pay premiums.[32] The Court relied heavily on Vol-

29. Huie, Community Property and Life Insurance U. of Texas Institute, Proc. 5th Ann.Tax Conf. (1957), pp. 118, 134.

30. Stephens, Life Insurance and Community Property in Texas—Revised, 10 S.W.L.J. 343, 355 (1956). See generally U. of Texas Institute, 5th Ann.Taxation Conference, 1957.

31. For example: "The rationale rests on the court's refusal to recognize the property aspects of life insurance * * In seeking simplicity, the court seems only to have perpetuated the logical inconsistency of labelling insurance as property for some purposes but not for others." Note, 35 Tex.L.Rev. 449 (1957).

32. Judge Garwood wrote a powerful dissent, contending that insurance *is* property. He argued strongly that the proceeds of the policies taken out during the marriage are community property and should go to the community estate. But he reaches the same conclusion that Professor Huie reaches and we reach, that insurance payable to a third person "may in a proper case amount to no more than legitimate gifts of community property". He is careful to say that "this idea is not inconsistent with the idea that the community has a real interest in the policy [rights]. Certainly the husband [as manager or trustee] [for the community] has a real interest". What offends Judge Garwood, and properly, is that the husband may use his position

unteer State Life Insurance Co. v. Hardin in holding that the named beneficiary is entitled to the proceeds where there is no fraud on the wife; limited Sherman v. Roe to its peculiar facts; and reaffirmed Martin v. McAllister. Martin v. Moran was distinguished—properly, it seems to us—on the ground that "under certain circumstances" a husband's making a policy payable to his estate may be a fraud on his wife [153 Tex. 1, 262 S.W. 2d 396]; here with the wife named as first beneficiary, there was no question of fraud. The opinion specifically recognizes that for tax purposes only, half the proceeds would be includible in the husband's estate under state inheritance tax laws, citing Blackmon v. Hansen, but pointed out that it was clearly established in Texas that proceeds payable to the wife were *her* separate property based upon the husband's right to make a gift.[33]

With due deference, it seems to us that the Texas courts were less enmeshed in conflicting concepts than some of their critics. The decision recognizes that insurance is community property as to policy rights, but that the transfer or conversion of those rights into proceeds-rights by a contract entered into by the husband *in the absence of fraud* cuts off the wife's community interest. This may put an excessive reliance on corrective action based on fraud, but it is a perfectly rational principle of the community system as long as the husband continues as managing partner.[34]

as trustee to augment his separate estate to the detriment of the community in cases where fraud may be difficult to find or may be absent. As Judge Garwood puts it: "[T]he community estate furnished all of the premiums * * * the Court holds the full proceeds to be separate estate of the husband * * * These sums of money, which, by every indicium classic in this and other community property states, are community property * * * become the separate estate of the assured husband merely because the contract happens to be one of life insurance".

33. The Texas legislature has attempted recently to settle the alleged uncertainty by amending the statutory definition of property. Tex.Sess.Laws 1957, c. 404. This amendment recites that an emergency was created by "the fact that the case of Warthan v. Haynes * * * casts some doubt on the status of life insurance policies as property". Accordingly, the definition of property in Article 23 of the 1925 Texas Revised Statute, Vernon's Ann.Civ.St. art. 23, was amended to include "life insurance policies and the effects thereof". As to the effect of this amendment see Swift, Housing Bill 900 and Your Life Insurance Policy, 20 Tex.Bar J. 691.

34. This result may offend our sensibilities. Unquestionably, it is inconsistent with the concept of the community as an equal partnership. But it is not an aberration in the community property system attributable to failure of Texas courts to recognize insurance as property. It is a logical, though perhaps unnecessarily rigid extension of the orthodox principle that the husband is manager of the community and may expend it "ever so unwisely, may squander it in riotous living, or may give it away". There is a tighter rein on the husband in some community states.

If we may say so, without being presumptuous, the solution is not to pass a law saying that insurance is property. There are a number of solutions. California attacks the problem broadly. Under section 172 of the West's Ann.California Civil Code, as interpreted in the courts, any gift of community property without the wife's written consent may be set aside as voidable. During the husband's lifetime the gift may be set aside completely; after the husband's death, insurance, for example, is voidable to the extent of one-half of the policy proceeds. New York Life Insurance Co. v. Bank of Italy, 1923, 60 Cal.App. 602, 214 P. 61. Narrowly, the legislature might declare that a gift from the husband to himself or to his estate is constructive fraud. Martin v. Moran almost said exactly this. Reimbursement of premiums to the community is a partial solution.

In Louisiana, as in Texas, a widow has no right to any part of insurance proceeds, if the policy is payable to a third person—even to her husband's illegitimate children or to his mistress. Sizeler v. Sizeler, 1930, 170 La. 128, 127 So. 388; Grayson v. Life Ins. Co. of Virginia, La. App.1932, 144 So. 643. But under Article 2408 of the LSA–Civil Code (and perhaps regardless of this article) a husband cannot appropriate community

Summarizing, and readily admitting that our review of the Texas cases tends to oversimplify a complex subject, it seems to us that the following conclusions may be drawn. (1) Without using the terms, Texas courts do in fact recognize that insurance is property and in their holdings, if not their opinions, break down property in insurance between policy-rights and proceeds-rights. (2) Policy-rights in an insurance policy are property, a community asset, when the insurance is purchased with community funds. (3) The wife has a present, vested interest in this asset, as she has in all other community property. (4) This interest ceases, in the absence of fraud, when the policy matures and the bundle of policy rights is converted into insurance proceeds payable to a named third-party beneficiary, just as the wife's interest in any other community asset is cut off by transfer of the assets to a third person. (5) The transfer is from the community. Under Blackmon v. Hansen, only half of the proceeds fall in the husband's taxable estate. The other half is a taxable gift from the wife. (6) The Tax Court, therefore, is mistaken in attaching importance to the fact that "Marie did not have a community interest in the proceeds of the policy as against the named beneficiaries". That is the orthodox situation with respect to transfers in the absence of fraud and is not inconsistent with subjecting Marie's half to a gift tax.

B. Prior to the enactment of the Revenue Act of 1942, the federal courts generally recognized the tax implications of accepting insurance as a community asset, whether the test of taxability was payment of premiums or possession of the incidents of ownership or both.[35] Some of the decisive cases were decided by this Court. This is of more than academic interest; in repealing the controversial provisions of the Revenue Act of 1942 and enacting the Revenue Act of 1948 Congress revitalized the pre-1942 interpretations of community property law.

The first important federal tax case dealing with insurance purchased with community funds was Newman v. Commissioner, 5 Cir., 1935, 76 F.2d 449, involving Louisiana law. The policy was revocably payable to the wife. This Court held that the proceeds were includible in full in the husband-insured's gross estate. The Court based its decision on the fact that the proceeds constituted a gift by the husband to the wife for which "the estate of neither is regarded as having paid the premiums so as to be entitled to reimbursement". On the same type of policy and the same regulation, using the premium payment test, the United States Supreme Court reached the opposite result from the result reached in the Newman case. In Lang v. Commissioner, 1938, 304 U.S. 264, 58 S. Ct. 880, 883, 82 L.Ed. 1331, the Supreme Court held that since community funds

property to his separate estate. Succession of Buddig, 1902, 108 La. 406, 32 So. 361; Succession of LeBlanc, 1917, 142 La. 27, 76 So. 223, L.R.A.1917F, 1137; 142 La. 27, 76 So. 223, L.R.A.1917F, 1137; Berry v. Franklin State Bank & Trust Co., 1937, 186 La. 623, 173 So. 126. Nabors, Insurance in Louisiana, 6 Tul.L. Rev. 515, 529 (1932).

35. In Hopkins v. Bacon, 1930, 282 U.S. 122, 51 S.Ct. 62, 63, 75 L.Ed. 249, involving income taxes, the United States Supreme Court carefully reviewed the Texas cases on community property, including Martin v. Moran, Martin v. McAllister, and Rowlett v. Mitchell. The Supreme Court concluded that the wife's

interest in community property in Texas is "properly characterized as a present vested interest", notwithstanding the husband's extensive powers of management and control. Husband and wife, therefore, are entitled to make separate income tax returns, each for one-half of the community income. A similar review and result were reached for Arizona in Goodell v. Koch, 1930, 282 U.S. 118, 51 S.Ct. 62, 75 L.Ed. 247; California in United States v. Malcolm, 1931, 282 U.S. 792, 51 S.Ct. 184, 75 L.Ed. 814; Louisiana in Bender v. Pfaff, 1930, 282 U.S. 127, 51 S.Ct. 64, 75 L.Ed. 252; and Washington in Poe v. Seaborn, 1930, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239.

were used to pay the premiums, the wife contributing half, that the policies were "taken out" by the deceased husband-insured only to the extent of one-half of the proceeds. "In the absence of a clear declaration it cannot be assumed that Congress intended insurance bought and paid for with the funds of another than the insured and not payable to the latter's estate, should be reckoned as a party of such estate for purpose of taxation." The Court held that the policies payable to the children should be accorded the same treatment as the policies payable to the wife.

DeLappe v. Commissioner, 5 Cir., 1940, 113 F.2d 48, concerned a Louisiana insured husband who took out policies during the marriage naming revocably his wife, children, and others as beneficiaries. At this time, under Regulation 80, the incidents of ownership test and the premium payment test were alternative tests of tax liability. Relying upon general principles of Louisiana law, this Court held that the proceeds of policies payable to a named beneficiary other than the estate of the deceased insured could be taxed in husband's estate only to the extent of one-half the proceeds. The Court specifically held that under community property principles, the wife owned one-half of the policies, since the insured husband paid premiums and exercised the incidents of ownership (including the power to change the beneficiary) as agent for the community, not as an individual owner. The DeLappe decision was followed in Howard v. United States, 5 Cir., 1942, 125 F.2d 986.

The rationale of the Lang, DeLappe, and Howard cases is applicable to the existing tax situation as to estate and gift taxes. "The net result should be, it would appear, that incidents of ownership possessed by the husband such as the reserved power to change beneficiaries, under circumstances where the pro-

ceeds are payable to a named beneficiary, rather than the insured's estate, are incidents of ownership held as agent of the marital community. Thus, the proceeds should be includible to the extent of only one-half in the estate of the insured." Eichenbaum, Estate Taxation of Insurance Proceeds in Community Property States, 1952 Tulane Tax Institute, 251.

C. For a number of years pressure built up against community property states. Taxpayers in other states considered that they were discriminated against in tax treatment. Finally, in 1942 Congress adopted amendments to the estate and gift tax laws aimed directly at the community property states. These amendments taxed all community property to the first spouse to die, regardless of the surviving spouse's vested ownership of half of the property. The brief language of former section 811(g) of the Internal Revenue Code was replaced with an entirely new section 811 (g) (4), the effect of which was to overrule by statute the Lang, DeLappe, and Howard cases. Under the 1942 law, the payment of premiums and the exercise of the incidents of ownership by the husband, was *not* as manager of the community but in his own behalf. This resulted in including all of the proceeds of insurance in the husband's estate.

The 1942 Act increased rather than diminished the agitation for equalization. It whetted the appetites of the common-law states for income tax equalization. It produced hardships and dissatisfaction among taxpayers in community property states.[36] After long negotiations between representatives of the taxpayers in the two groups of states, and representatives of the Treasury and of Congress, with all ultimately in agreement, Congress repealed the unfortunate amendments in the 1942 Act and adopted the equalization bill as part of the Revenue Act of 1948.[37] This law makes com-

36. The community property states made a concerted but unsuccessful frontal attack on the constitutionality of the amendments. Fernandez v. Wiener, 1945, 326 U.S. 340, 66 S.Ct. 178, 90 L.

Ed. 116. See Jackson, The Wiener case, 18 Tul.L.Rev. 525 (1944).

37. Revenue Act of 1948, Sections 301, 302, 303, 351, 361, 363, amending Int.Rev.

prehensive changes in income, gift, and estate tax laws designed to equalize all these taxes between taxpayers in common law states and taxpayers in community states. The 1948 Act recognizes the realities of spousal ownership in a community property system. Equalization in income taxes is achieved by allowing the joint return. Equalization in estate and gift taxes is achieved for non-community property by the marital deduction and split gift provisions.[38] In the case of life insurance, the repeal of Section 811(g) (4) was intended to make applicable the rules of Section 811(g) which would be applicable had paragraph (4) never been contained in Section 811 (g).

The effect of repeal of the 1942 Act is to bring a return to the rule of the Lang, DeLappe, and Howard cases: incidents of ownership possessed by the husband, such as the power to change beneficiaries, are held as agent of the community; the proceeds, therefore, are includible to the extent of only one-half in the estate of the insured; the other half would be taxable as a gift by the wife, if the proceeds are payable to a third person. In order to conform the Treasury Regulations with the equalization measures, the Commissioner issued Treasury Decisions 5698 and 5699, 1949-1, 181, 226, the Cum.Bull. 181, 266 amending the gift and estate tax regulations. Treasury Decision 5698, issued May 13, 1949 added to the gift tax regulations, Section 86.2(a), the following subsection:

"(9) Where property held by a husband and wife as community property is used to purchase insurance upon the husband's life and a third person is revocably designated as beneficiary and under the State law the husband's death is considered to make absolute the transfer by the wife, there is a gift by the wife at the time of such death of one-half the amount of the proceeds of such insurance."

After some uncertainty, the Internal Revenue Bureau has clarified its position by several rulings. Rev.Rul. 48, 1953-1 Cum.Bull. 392;[39] Rev.Rul. 232, 1953-22 Cum.Bull. 21. These rulings recognize that the policy-rights in insurance payable revocably to a third person beneficiary inure to the benefit of the community; therefore, under Treasury Regulations 105, Section 81.27 the proceeds are includible in the insured's gross estate to the extent of one-half under the incidents of ownership tests; and, under Treasury Regulations 108, Section 86.2(a) (9), the wife makes a gift of the other half upon the death of the insured husband.

Cutting through all of this review of cases and statutes and regulations is the sharp knife of the intendment of Congress in imposing gift and estate taxes generally, and as set forth in the 1948 Act. Failure to give effect to the regulations will defeat the national policy of tax equalization.

 Judges and lawyers hypnotize themselves with words. In Texas the

Code of 1939, Sections 12, 23(aa), 51(b), 811(d), (Sec. 811(c) (2) repealed), 812, 813 and 936(b). For a statement of the adverse reaction to the 1948 Act of an informed attorney with a common-law point of view, see Surrey, Federal Taxation of the Family—the Revenue Act of 1948, 61 Harv.L.Rev. 1097 (1948).

38. Int.Rev.Code of 1939, Sec. 812(e) as amended, Int.Rev.Code of 1954, Sec. 2056; Int.Rev.Code of 1939, Sections 1000, 1004 as amended, Int.Rev.Code of 1954, Sections 2513, 2523.

39. "It is the position of the Bureau that, under the laws of Louisiana and Texas, a gift by the wife of one-half of the policy proceeds becomes absolute, for Federal gift tax purposes, upon the death of the husband, unless he purchased the policy with intent to defraud the wife, since at that time the community is dissolved, the authority of the husband as statutory manager of the community is ended, the policy matures, and the wife's interest therein is terminated * * *." Rev. Rul. 48, 1953-1 Cum.Bull. 392.

words were: "insurance is not property". The Tax Court here could not escape the phrase, "the wife has no interest in *proceeds*". But gift and estate taxation of insurance is not based on receipt of proceeds. It is based on the *transfer* of property rights.[40] All gift and estate taxes are based on the transfer of effective control over property rights, not the donee's or heir's receipt of property. Insurance proceeds are a measure of the value of the transfer. "The question propounded by the Court of Claims in form suggest that the tax is one imposed by the statute upon the policies. This we have shown is not the case. It is the transfer, \* \* \* which is the subject of the tax. The tax is not on the policies." Chase National Bank of City of New York v. United States, 1939, 278 U.S. 327, 49 S.Ct. 126, 129, 73 L.Ed. 405. The Newman case was overruled, but what this Court said in that case as to the incidence of gift taxes, we say again now, with a slight change, italicized: "We think it plain that the statute in question imposes a death tax, not upon the proceeds of insurance policies, the property of the estate, nor upon the proceeds of insurance policies which but for the gift to the beneficiary would be owned by decedent, *but upon the cessation,* \* \* \* *of* the control he had over the policies, [*as agent of the community*] so that his death vested in the beneficiary a settled right which she did not have before." Newman v. Commissioner, 5 Cir., 1935, 76 F.2d 449, 450, 452. See also Commissioner of Internal Revenue v. Wemyss, 1945, 324 U.S. 303, 65 S.Ct. 652, 89 L.Ed. 958; Commissioner of Internal Revenue v. Berger, 2 Cir., 1952, 201 F.2d 171; Hooker v. Commissioner, 5 Cir., 1949, 174 F.2d 863.

In a community property state where insurance on the husband's life is purchased with community funds, payable revocably to a third person beneficiary, the husband's right to change the beneficiary and all other control over the property are held as agent of the community. The bundle of rights in the policy is owned by the community. Something happens to this bundle when the insured dies, thereby terminating his control over the property and bringing the community to an end. What happens is, that the community's property interests in the policy-rights are transformed into the beneficiary's right to the proceeds. It is a shift in control and a shift of beneficial interest. This is the transfer that is taxed.

Up to the time of his death, Daniel, as managing agent of the community, had the right to change beneficiaries. When he died without exercising this right, the transfer to the trustee was a completed gift from the community: one-half therefore should have fallen in the taxable estate of the deceased husband. The other half is a taxable gift from the surviving spouse.

 Under the terms of the trust agreement Marie was the income beneficiary for life. Accordingly, the measure of her gift was half the amount of the proceeds less a life estate in that half.

### VII. Transferee Liability.

On appeal counsel for the taxpayer argue that even if Marie made a gift at the time of Daniel's death, the value of such gift could not exceed the value of her half of the cash surrender value of the policies less the value of her retained life interest.

40. In Blackmon v. Hansen, 1943, 140 Tex. 536, 169 S.W.2d 962 the Texas Supreme Court pointed out that the federal estate tax is measured by the right to transfer and the state tax inheritance tax by the right to receive. But, said the Court, "after all, the two laws are similar, in that the *transfer taxed is of the same thing,* the receipt whereof is taxed". The Blackmon case held that where insurance is payable to the husband's estate, one half of the proceeds only is included in the husband's estate. Thompson v. Calvert, Tex.Civ.App.1957, 301 S.W.2d 496 held that where the insured husband survived the wife, one half of the cash surrender value of the insurance is included in the estate of the deceased wife.

Counsel cite Womack v. Womack and Warthan v. Haynes. The Womack case was a divorce suit. Both spouses were still alive. The only property that could be divided was the cash surrender value. In the Warthan case, although the wife died first, cash surrender values were not at issue; the Court awarded the proceeds to the named beneficiary (the husband's separate estate). More in point is Blackmon v. Hansen holding that where insurance is paid for with community funds, one-half of the proceeds should be included in the husband's estate for state inheritance tax purposes; "one-half [is] the property of the wife, and that said part is no part of the estate of the husband."

Counsel for the taxpayer relies on a line of cases involving transferee liability for income taxes, citing especially two recent Supreme Court decisions: Commissioner v. Stern, 1958, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 and United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135. These cases and similar cases involving transferee liability for income taxes are inapplicable. The Supreme Court considered that transferee liability depended on whether or not a federal lien attached while the insured, the tax debtor, was still alive. If so, the commissioner could collect up to the cash surrender value only.[41] In cases involving income taxes, the liability necessarily attaches during the life of the insured, when the only property that the debtor has in insurance (disregarding replacement value or reserve value) is the cash surrender value. That is all he could transfer and all that could be subject to the government's lien. It is quite different from transferee liability for estate or gift taxes. Here, liability cannot attach until the transfer; and the transfer itself is the subject of

the tax liability. Cash surrender has no significance in this case; the transfer is of proceeds.

As the court pointed out expressly in Rowen v. Commissioner, 2 Cir., 1954, 215 F.2d 641, 646, 647, the "cash surrender value were assets of the decedent in his lifetime"; the proceeds of insurance policies were subject to transferee liability in the hands of the beneficiaries for estate tax purposes. The result would be the same as to the gift tax. The two taxes are in *pari materia* and must be construed together. Merrill v. Fahs, 1945, 324 U.S. 308, 311, 65 S.Ct. 655, 89 L.Ed. 963. The gift tax transferee provisions (Section 1025 of the 1939 Code) like the estate tax provisions (Sections 827 and 900 of the 1939 Code) plainly extend to all transferred property including the proceeds of life insurance.

## VIII. The Living Trust.

The Tax Court held that the living trust was "clearly testamentary". The principal therefore remained community property, and Daniel had no power to deprive Marie of her share of the community. When, however, Marie "chose to abide by the terms of the trust in accepting payments of income, she elected to waive and surrender her property interest in the principal thereof and made a taxable gift".

This reasoning disregards the fact that if the trust were testamentary, it would be invalid because of the Statute of Wills, and Daniel's half would fall into his residuary estate. Marie could not cure the invalidity by surrendering her half of the community. There would be no valid trust to which she could surrender her property.

A. Scott,[42] Bogert,[43] and the Restatement[44] do not share the Tax

---

**41.** It has been argued that the beneficiary should be liable for the full proceeds transferred. Grayck, Transferee Liability of Insurance Beneficiary, 13 Tax Law Rev. 313 (1958).

**42.** See 1 Scott on Trusts, Section 57, p. 442 et seq.

**43.** "A trust is not made testamentary by the coupling together of a life interest in the settlor and a power in him to revoke, or the joinder of these two factors." 1 Bogert, Section 103, p. 483. The most recent ALR annotation in this subject summarizes the law: "The later

Court view that such a trust is "clearly testamentary". On the contrary, "It has been universally held that the creation of a trust inter vivos is not a testamentary disposition merely because the settlor reserves a power to revoke the trust or to modify it, even though in addition he reserves a beneficial life interest in the trust property." Scott, The Effects of a Power to Revoke a Trust, 57 Harv.L.Rev. 362, 368 (1944). Virtually no cases can be found holding a contrary view. The trust comes into being at the time when the settlor delivers the property to the trustee, and all the beneficiaries acquire interests in the trust at that time, even though there is a condition subsequent allowing the settlor to deprive the beneficiaries of their interests. Unlike a will, "the death of the settlor is not a condition precedent to the vesting of the interest in the beneficiary. The distinction between a disposition to take effect only on the death of the donor and one to take effect immediately but subject to be revoked may seem to be formal rather than substantial, but it is an important one, and one which has a determinative effect on other problems [the reach of creditors, for example]." 1 Scott on Trusts, Section 57.1, p. 445. Here, Marie acquired an interest when the trust was created. It was subject to divestment, but once acquired, it might

never be divested. In fact, it was not divested.

■ Add the power to modify and revoke the trust, and the law is still clear that the trust is on the right side of the line. Add the element of control over the trustee's administration and the trust may cross the line or come so close to the line that courts will divide as to whether a trust is not a trust but a will, depending on the degree of control reserved. Where, however, in an "illusory" trust the settlor "reserves such power to control the trustee in the administration of the trust that in effect the trustee is merely his agent acting under his direction, the disposition is testamentary". Scott, The Effects of a Power to Revoke a Trust, 57 Harv.L.Rev. 362, 371 (1944).

Here, a close examination of the Moran living trust agreement shows not a word or clause to indicate any intention by the settlor to control the trustee. Further, the trustee is given broad powers of administration, including the right to retain or purchase non-legals and "in its discretion" to make any investments "it may choose".

B. In concluding that the trust was testamentary, the Tax Court relies on a line of New York cases holding certain trusts "illusory", citing the leading case of Newman v. Dore, 1937, 275 N.Y. 371,

cases agree that the two elements, reservation of a life interest and a power to revoke, do not invalidate a deed of trust or render it to any extent inoperative for want of execution as a will. This holds true notwithstanding the reservations of all the income * * * for the settlor's life". 1953, 32 A.L.R.2d 1270, 1272.

44. Scott, Reporter for the Restatement of Trusts, makes the point that the nature of the trust instrument is important. "If the creation of a trust is evidenced by a formal trust instrument, it would seem that the danger of fraud is not increased by the fact that the settlor may have reserved extensive powers." A revision of the Restatement of Trusts, Section 57, adopted in 1947 reads: "Where by the terms of the trust an interest passes to the beneficiary during the life

of the settlor, the trust is not testamentary merely because the settlor reserves a beneficial life estate or because he reserves in addition a power to revoke the trust in whole or in part and a power to modify the trust, *and a power to control the trustee as to the Administration of the trust, and the disposition will not be invalid for failure to comply with the requirements of the Statute of Wills unless the terms are so informally stated and the power of control reserved is so great that it would violate the policy of the Statute of Wills to enforce it."* The italicized language was added in the 1947 revision of the section orginally adopted in 1935. The Moran trust agreement is a typical formal trust instrument of the type used by New York banks.

9 N.E.2d 966, 112 A.L.R. 643, Hirschfield v. Ralston, Sup.1926, 66 N.Y.S.2d 59, and In re Sanchez' Estate, Sur.1945, 58 N.Y.S.2d 230. With due deference, it seems to us that these cases are inapplicable.

In Newman v. Dore [275 N.Y. 371, 9 N.E.2d 968] a married man transferred *all* of his property in trust reserving a life estate and the power of revocation. The trust agreement stated that trustee's powers were "subject to the settlor's control during his life" and could be exercised "in such manner only as the settlor shall from time to time direct in writing". As the Court said, "the settlor reserved substantially the same rights to enjoy and control the disposition of the property he previously had possessed". In re Sanchez' Estate concerned a transfer of a stock certificate by a husband with intent to defraud his creditors, among them his wife from whom he was separated. Sanchez retained possession and control of the certificate. The Court found that the transfer was fraudulent and illusory. In Hirschfield v. Ralston the complaint alleged that a husband conveyed his business to a third person through transfer of stock, to defraud his wife of her distributive share of his estate and to disinherit his daughter. The Court held that the complaint failed to state a cause of action, because there was no allegation that the husband owned and controlled the business and the stock at the time of his death.

These cases are typical of illusory trusts. There is seldom an express trust by agreement, as in the Moran trust, or, if there is, the settlor in terms reserves virtually complete control over the trustee's administration of the trust. In either instance, the transferor reserves such a degree of control over the property that the Court is driven to the conclusion there is no real intent to trans-

fer and that the whole transaction is **a** sham.[45]

In addition, in the illusory trust cases there is an intent to deprive the wife of her expectant interest, her distributive share, and in most of the cases there is an intent to defraud the wife by transferring property to a third person. In none of the cases does the husband give his wife any beneficial interest in the so-called trust. None of these circumstances are shown to exist here. Newman died three days after he executed his trust. Had the Newman trust been upheld, his wife would have received nothing. Had Daniel died three days after November 28, 1948, the value of Marie's life interest in the whole of the trust estate would have exceeded the value of her half interest in the community. There is nothing in the record to show that Daniel influenced the trustee in any way in its administration of the trust. There is no showing that the income from the Moran living trust was handled any differently from Daniel's earnings and other income; even revenue from a husband's separate property is community, under the law of Texas.

It must be borne in mind that *Daniel did not create the trust. The community created it.* Any rights that were reserved in the settlor were rights held by the community. Newman exercised control over his trust property for himself; Daniel's control (in his case restricted to the right of revocation and modification) could be exercised only as *agent for the community*.

Much closer in point is Marine Midland Trust Co. of Binghamton v. Stanford, 1939, 256 App.Div. 26, 9 N.Y.S.2d 648, affirmed mem. 1939, 281 N.Y. 760, 24 N.E.2d 20. There the Court upheld a transfer in trust where a husband retained the life estate, right of revocation and modification, and also the right to

---

45. In the illusory trust cases, "the settlor's control over property during his lifetime is so complete that to hold that it should not be included in the determination of the widow's distributive share would be clearly a violation of

the statute which is to give the widow a share of all the property owned by him on his death". Scott, The Effects of a Power to Revoke a Trust, 57 Harv.L. Rev. 362, 371 (1944).

withdraw the principal not to exceed $2,-000 in any year. The husband had previously turned over a little better than half of his estate to his wife from whom he was separated. The Court distinguished Newman v. Dore on the grounds that a trust is not illusory, if made with intent to transfer actual title. In arriving at the intent the Court emphasized that equities between the spouses may be considered.[46]

In the "illusory" trust cases the wife receives nothing. In each case the transfer is a sham devised by the husband to deprive the wife of her distributive share by making a purported gift to another while still retaining control. Here there is no pretense of any fraud. There is no showing that Daniel intended to deprive Marie of any rights or that the trust had that effect. On the contrary, Daniel wanted his wife to have her share and his too, but free of the burden of capital management. The income he received was community income.

C. There are no illusory trust cases in Texas. The fact situation in such cases would be subject to the principle

that, in the absence of fraud, a husband may transfer community property by gift or sale although the effect may be to divest the wife of her one-half interest in the property. To set aside a transfer as fraudulent, there would have to be an action by the wife or her heirs.

The Tax Court states, however, that under the law of Texas the living trust was not sufficient to pass a present interest, citing Armington v. Gilcrease Oil Co., Tex.Civ.App., 190 S.W.2d 587, 595; Fleck v. Baldwin, 141 Tex. 340, 345, 172 S.W.2d 975, 978; Bridewell v. Clay, Tex. Civ.App., 185 S.W.2d 170, 172 and Postal Mutual Indemnity Co. v. Penn, Tex.Civ. App., 165 S.W.2d 495, 499.

This statement is not in accord with our understanding of the law of Texas. Bridewell v. Clay and Postal Mutual Indemnity Co. v. Penn did not involve trusts. Bridewell v. Clay simply held that a gift of a check is revocable until presented for payment. In Postal Mutual Indemnity Co. v. Penn, a workmen's compensation case concerning proof of dependency, the question was whether the dependent wife had received certain rent

---

46. Dunnett v. Shields, 1924, 97 Vt. 419, 123 A. 626, 631, is not a New York case, but in applying the illusory trust doctrine New York courts have of course relied, in part, on decisions of other states. In that case a widow brought suit to set aside a trust created by her husband during his lifetime. The widow claimed that the trust was invalid because it was a fraud upon her rights to her elective share. The trust reserved the right of revocation to the husband-settlor and also gave the husband a life estate in the trust income. At his death the wife was to have a life estate in the income, and at her death the trust provided for the ultimate distribution of the principal to others. The court expressly found that the trust was made for the purpose of providing income to the wife after the husband's death, and that the trust was set up so that the property would not become a part of the husband's estate and as such subject to the exercise of the widow's statutory rights. The issue as stated by the court was whether when no express intent to defraud is found in fact, such a conveyance as was made in the instant case can be said to

be fraudulent in law. The court held no. Actual fraud in fact must be proved, and the mere fact that the settlor knew the effect of the conveyance was to deprive the wife of her elective share and give her a life estate in the same property does not give rise to a legal presumption of fraud. The Court stated: " * * * can it be said that where provision is made 'primarily for the benefit of the widow, who has the right thereunder, if necessary, to have the entire estate used for her support,' * * * that the trust fails in the eyes of the law? We do not think so." See also National Shawmut Bank of Boston v. Cumming, 1950, 325 Mass. 457, 91 N.E.2d 337; Kerwin v. Donaghy, 1945, 317 Mass. 559, 59 N.E. 2d 299; Boyle v. John M. Smyth Co., 1928, 248 Ill.App. 57. In Beirne v. Continental Equitable Title and Trust Co., 1932, 307 Pa. 570, 161 A. 721 the Court upheld a trust where the husband had the right to revoke and reserved the life estate but had no control over the trustee—although the declared purpose of the trust was to defeat the wife's rights in any assets.

as a gift. In Armington v. Gilcrease the Armingtons purchased mineral leases but directed the seller to delay execution of the assignments until they decided to whom they wanted to make the assignments, reserving the revenue for themselves in the meantime. They had complete control and the gifts were never completed. Fleck v. Baldwin involved so-called "tentative trusts", bank savings accounts and certificates for stock in building and loan companies, placed in the name of "Mrs. J. C. Baldwin, in trust for—Mrs. Fleck". Mrs. Baldwin retained possession of the passbooks and certificates and, as the Court said [141 Tex. 340, 172 S.W.2d 979], "she still regarded them as her own * * * and never intentionally parted with her right personally to exercise dominion and control over any part of her estate but constantly retained and exercised the authority to use and dispose of it as she willed".

We have not found any Texas case that passed directly on the facts as presented by the Moran trust agreement. We believe that Texas courts would uphold the trust. Schmidt v. Schmidt, Tex.Civ.App. 1953, 261 S.W.2d 892, 895 distinguished Fleck v. Baldwin and similar cases: "Each of the cited cases involved the question whether or not certain acts by a principal constituted a 'gift inter vivos' or simply an 'agency'. * * * None of those cases is authority for the proposition that the owner of land may not convey the legal title thereto to another person and retain in himself the equitable or beneficial title", citing the Restatement, 1 Trusts, Sec. 114, and the Texas Trust Act, Article 7425b–7 of the Revised Civil Statutes of Texas, Vernon's Ann.Civ.St. This article permits a settlor to be a beneficiary. Article 7425b–41 provides that "every trust shall be revocable by the trustor during his lifetime, unless expressly made irrevocable". Together, the two articles seem to say that there is no logical impediment in Texas trust concepts to a trust such as the Moran living trust.

We hold that the Moran living trust was not ambulatory; it was a present, valid trust created in 1928. Marie is the income beneficiary under the express terms of that trust and not because she receives the income in exchange for relinquishing her half of the community as part of an assumed election to accept the benefits of the trust. We do not have before us, therefore, the question at issue in Commissioner of Internal Revenue v. Siegel, 9 Cir., 1958, 250 F.2d 339, that is, whether the wife's election to take under the will should be considered as a gift by the wife or a purchase of an annuity supported by consideration.

 D. Our holding does not mean that gift tax consequences attached at the time the trustee took title in 1928. In a transfer of property valid under state law, state law focuses on title. The federal gift and estate tax law focuses on transfer of the beneficial enjoyment of the property. One who creates a trust during his lifetime, even though he reserves a life estate, parts with legal title to the trustee and grants to the beneficiaries (including remainderman) an immediate equitable title. Transfer of the possession and enjoyment of the property may be deferred until some future time. It is this very situation that causes the application of the gift and estate tax laws. Treasury Regulation 108, Section 86.3 provide therefore: "A gift [for tax purposes] is incomplete in every instance where a donor reserves the power to revest the beneficial title to the property in himself." The taxable incident is the shifting of the beneficial enjoyment in the trust property, no matter when title is vested. See Brady v. Ham, 1 Cir., 1930, 45 F.2d 454.

Since Daniel retained the power of revocation (for the community), there was no taxable gift until the shift in beneficial enjoyment at his death. Estate of Sanford v. Commissioner, 1939, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20; Burnet v. Guggenheim, 1933, 288 U.S. 280, 53 S.Ct. 369, 77 L.Ed. 748. When Daniel died the trust became irrevocable.

His community one-half should have been included in his gross estate under Section 811(c) and 811(d) of the 1939 Code, and Marie made a taxable gift of the other half under Treasury Regulations, Section 86.2 and 86.3 less her retained life estate in such one-half.

Had Daniel been acting for himself instead of for the community, and had the right of revocation been retained by him individually the taxpayer would have been on stronger ground to urge that, as to Marie, the gift was complete in 1928. But it was as agent for the community, that Daniel held the right of revocation. For tax purposes the gift was incomplete until the right of revocation ceased on Daniel's death.

### IX. Conclusion.

Summarizing, we hold as follows:

1. As to the testamentary trust, we hold in favor of the taxpayer. The will of Daniel Moran did not put his wife to an election, nor did she elect (assuming that the will put her to an election). There was, therefore, no taxable gift of Marie Moran's share of the community to the testamentary trust.

2. As to the insurance trust, we hold in favor of the Commissioner. On the death of the insured, for tax purposes half of the proceeds of the insurance belonged in Daniel Moran's gross estate and the other half was a taxable transfer from Mrs. Moran, less her retained life interest in that half.

3. As to the living trust, we hold partly in favor of the Commissioner and partly in favor of the taxpayer. We hold that on Daniel Moran's death the trust became irrevocable. His half of the community belonged in his gross estate and his wife's half was a taxable gift to the trust less her retained life interest in that half.

Accordingly, the judgment is Reversed and the case Remanded for any appropriate proceedings not inconsistent with this opinion.